## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2012 JUL 30 A 11: 36

JON A. SANFILIPPO
12-C-0775
CLERK

BRENT M. NELSON,
bringing this action on behalf of the
United States of America,

                                    **COMPLAINT**
                Relator,            **(JURY TRIAL DEMANDED)**

                                    COMPLAINT FILED IN CAMERA
v.                                  AND UNDER SEAL PURSUANT
                                    TO 31 U.S.C. § 3730(B)(2)

Career Education Corporation,
Sanford-Brown, Limited, and Ultrasound
Technical Services, Inc.,

                Defendants.

---

Comes now the Relator Brent M. Nelson, in the name of the United States

pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, by

and through his undersigned attorneys, Nichols Kaster PLLP, and for his Complaint

alleges as follows:

### INTRODUCTION

1.    Brent M. Nelson ("Relator") brings this action under the False Claims Act,

31 U.S.C. § 3729, *et seq.*, as amended ("FCA"), against Defendants Career Education

Corporation ("CEC"), Sanford-Brown, Limited ("Sanford-Brown"), and Ultrasound

Technical Services, Inc. ("Ultrasound") (collectively "Defendants") to recover money

damages and civil penalties arising from false claims approved and presented by

Defendants to obtain millions of dollars annually from the United States Department of

1

Education ("DOE") pursuant to the Higher Education Act, Title IV ("Title IV/HEA"), from in or around 2006 continually through the present.

2. Defendants are recipients of Title IV/HEA federal student financial aid funds from the DOE; specifically, all of CEC's Sanford-Brown College and Institute locations across the nation receive such funding.

3. In requesting and receiving millions of dollars annually, Defendants have engaged in a protracted course and pattern of fraudulent conduct to submit false claims for payment to or approval by the United States.

4. First, Defendants falsely represent every year that they are in compliance with HEA's prohibition against using incentive payments for employees for recruiting activities, which is a core prerequisite to eligibility for the Title IV funds.

5. Second, Defendants reported, and continue to report, misleading, inaccurate and fraudulent figures and data to accrediting agencies relating to student grades and graduate placement rates.

6. Finally, Defendants falsely report that they adhere to HEA's requirement that at least 10% of tuition must be received from sources other than federal funding.

7. Defendants had, and continue to have, actual knowledge that it is not adhering to the Title IV/HEA requirements, that its representations of adherence were and are false, and that it therefore was and is submitting false or fraudulent representations of compliance. Alternatively, Defendants act and have acted with deliberate indifference and/or reckless disregard as to the truth or falsity of the claims.

2

8.     Relator asserts causes of action under the False Claims Act for submission of knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1) and (2).

## JURISDICITION AND VENUE

9.     Relator hereby alleges causes of action under 31 U.S.C. §§ 3729, *et seq.*, of the False Claims Act, arising from Defendants' wrongful conduct and pattern of fraudulent conduct incident to obtaining funds from the DOE pursuant to the Higher Education Act, Title IV.

10.     Relator is the original source of all the allegations contained in this Complaint and there has been no public disclosure of the allegations contained in this Complaint.

11.     Pursuant to the requirements of the False Claims Act, Relator has provided the government with a confidential disclosure statement and exhibits to substantiate his allegations.

12.     Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3732 and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

13.     Venue and jurisdiction are proper in the United States District Court, Eastern District of Wisconsin, pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732, as Defendants are organizations subject to personal jurisdiction in Milwaukee, Wisconsin,

3

and because Defendants maintain and operate a Sanford-Brown campus in this jurisdiction.

## PARTIES

14.    Relator, Brent M. Nelson, resides in Waunakee, Wisconsin. Relator received both a Bachelor of Arts in Journalism and a Master of Science in Education, Curriculum and Instruction/Educational technology from the University of Wisconsin-Madison. Relator has been employed in the education field in various capacities since 1988 and played a vital role in developing, operating and promoting numerous post-graduate programs throughout the State of Wisconsin. From January 2009 to the present, Relator has been employed as the Academic Program Manager/Learning Specialist at the University of Wisconsin School of Medicine and Public Health.

15.    Prior to that, Relator worked for Defendants as the Director of Education/Chief Education Officer at Sanford-Brown College in Milwaukee, Wisconsin (hereinafter "SBC") from roughly June 2008 until January 2009. Some of Relator's job duties in his position as Director of Education included the following: (1) maintain compliance with accrediting policies in the areas of instruction, curriculum, and satisfactory academic and attendance progress to ensure continued state and accrediting agency licensing; (2) develop the academic budget and manage expenditures throughout the year; (3) develop and implement retention policies and practices; and (4) maintain student management database and generate appropriate reports. Relator reported directly to the President of SBC, Steve Guell.

4

16. Through his role at SBC, Relator obtained independent knowledge of the factual allegations contained herein.

17. Defendant Career Education Corporation is a Delaware corporation with a registered address of 2711 Centerville Road, Suite 400, Wilmington, DE 19808. CEC's principal office is located at 2895 Greenspoint Parkway, Suite 600, Hoffman Estates, IL 60195. CEC operates a chain of for-profit colleges, schools and universities nationwide. The institutions under the CEC umbrella include American InterContinental University, Brooks Institute, Colorado Technical University, Harrington College of Design, INSEEC Schools, International Academy of Design & Technology, Le Cordon Bleu North America, and Sanford-Brown Institutes and Colleges. CEC operates roughly 40 Sanford-Brown schools alone, and holds itself out to be one of the world's leading providers of private sector education. CEC's website is http://www.careered.com/About-CEC.

18. Defendant Sandford-Brown, Limited is a subsidiary of CEC with a registered address of 8040 Excelsior Drive, Suite 400, Madison, Wisconsin 53717. On information and belief, Sanford-Brown, Limited co-operates Sanford-Brown College, Milwaukee, which offers Associates degrees and technical training to students. SBC's principal place of business is 6737 West Washington Street, Suite 2355, West Allis, Wisconsin 53214, and its website is http://www.careered.com/Our-Schools/Sanford-Brown/SB-Milwaukee.

19. Ultrasound Technical Services, Inc. is a domestic corporation that operated SBC through December 2011. During Relator's tenure as Director of Education, SBC represented to accrediting agencies that it was owned by Ultrasound Technical Services,

5

Inc. and "ultimately wholly owned" by CEC. From April 2005 through approximately December 2011, employees of SBC received paychecks from Ultrasound Technical Services, Inc. According to the Wisconsin Secretary of State, Ultrasound Technical Services, Inc. became inactive in January 2012. On information and belief, current employees receive paychecks from Sanford-Brown, Limited.

## FACTUAL ALLEGATIONS

### Requirements for Participation in Title IV/HEA Programs

20.    Under Title IV of the Higher Education Act of 1965, Congress established various student loan and grant programs, including the Federal Pell Grant Program ("Pell"), Federal Supplemental Educational Opportunity Grant ("FSEOG"), Federal Stafford, Federal Work Study ("FWS"), Federal Family Education Loan Program ("FFELP"), and Federal Direct Loan Program ("FDLP"), to assist in making available the benefits of postsecondary education to eligible students in institutions of higher education.

21.    The majority of Defendants' students apply for and receive federal Title IV/HEA program assistance to pay for tuition and school related expenses. Funding through Pell, FSEOG, Federal Stafford and FWS was and, on information and belief, continues to be available to students of Sanford-Brown Colleges and Institutes nationwide.

22.    In order for Defendants' students to apply for and obtain Title IV/HEA program assistance, SBC must be an eligible institution and be permitted to participate in the programs by the Secretary of Education.

6

23. As a condition to allowing their students to receive federal funding under Title IV/HEA, Defendants were required to sign a Program Participation Agreement ("PPA"), whereby they agreed to comply with certain statutory, regulatory and contractual requirements detailed in 20 U.S.C. § 1094 and supporting regulations, including 34 C.F.R. § 668.14.

24. In particular, the PPA prohibits "any commission, bonus or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of Title IV, HEA program funds." 34 C.F.R. § 668.14(22).

25. The PPA also requires that Defendants "will meet the requirements established by... accrediting agencies or associations...." 20 U.S.C. §1094(21). Defendants, by entering into a PPA, agreed to provide accurate information to the nationally recognized accrediting agency that accredits CEC or any of its Sanford-Brown College or Institute branch campuses, other locations or educational programs. 20 U.S.C. § 1094(c)(3)(A).

26. Finally, the PPA requires that a proprietary educational institution "derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds..." 34 C.F.R. § 668.14(16).

27. Because eligibility for participation in and funding from Title IV/HEA federal student loan programs is conditioned on a promise to abide by the provisions of the PPA, an educational institution that falsely states to the government that it is in

7

compliance with such rules and regulations is exposed to liability under the False Claims Act.

## Accreditation Requirements

28. SBC, along with the other Sanford-Brown Colleges and Institutes, has been institutionally accredited by the Accrediting Council for Independent Colleges and Schools ("ACICS" or "Council"), a national accrediting agency recognized by the DOE and the Council for Higher Education Accreditation ("CHEA"). According to CEC's website, "[t]his indicates that these schools substantially meet or exceed the stated criteria of education quality established by ACICS, and approved by the DOE and CHEA. This recognition of institutional accreditation by ACICS entitles SBC to offer Title IV Financial Assistance to students who qualify."

29. SBC received initial approval from ACICS on April 19, 2005, and five-year accreditation was granted in December 2006.

30. By applying for and receiving accreditation, Defendants accepted the obligation to demonstrate compliance with the standards of accreditation. *See* ACICS website at http://www.acics.org/publications/criteria.aspx#3-1-100. In order to maintain accreditation, Defendants are required to submit Annual Accountability Reports, comply with Council guidelines and be certified by the Chief Executive Officer of the institution.

31. According to ACICS standards, "[d]ata must be submitted separately on the Campus Accountability Report (CAR) for each main campus and for each additional location. A distributed enterprise must also submit a consolidated Institutional Accountability Report (IAR) containing information and data on the institution as a

8

whole. These reports are due on or before September 15 annually. Failure to submit the Annual Institutional Report in a timely manner will result in the revocation of accreditation."

32. The Council reviews the Campus Accountability Report ("CAR") and Institutional Accountability Report ("IAR") to monitor performance in terms of student achievement at both the campus and program levels. Measures include retention, placement, and licensure, registration or certification pass rates.

33. Each year, SBC substantially misrepresents of the nature of its educational program, and the employability of its graduates in the IARs it submits to ACICS.

**Defendants' Predatory Education Model**

34. The Sanford-Brown Colleges and Institutes across the country provide education to predominately low-income students, most of whom have remedial learning needs.

35. During Relator's tenure, SBC's Mission Statement was as follows: "to offer highly focused, high quality, short-term, degree and non-degree career-oriented programs for the purpose of enabling each student to: successfully complete his/her program of study; take to the employer and the community appropriate professional attitudes and behaviors, competitive skills, and reliable performance; build self-respect and confidence; and provide the foundation for success in future educational endeavors."

36. Rather than provide the individualized and specific attention required by students with remedial needs, Defendants' education model was, and on information and belief continues to be, a Title IV scam whereby Defendants target individuals eligible for

9

federal funding and place them in accelerated programs within one of the Sanford-Brown schools, maximizing the number of students attending the Sanford-Brown programs each year.

37.     SBC required all of its employees, including admissions department employees and faculty alike, to help SBC maximize tuition received through Title IV/HEA program funding.    For example, all employees were pressured by senior management to 1) admit as many students as possible, 2) ensure students showed up to class, and 3) give students a passing grade.    Notably, Title IV/HEA funding is only allocated to students who 1) are admitted to an eligible program, 2) attend a certain number of classes each semester, and 3) maintain at least a 2.0 grade point average.

### *Admitting Unqualified Candidates*

38.     All prospective students were, and on information and belief are, required to take a Career Program Assessment ("CPAT") exam before being admitted into a Sanford-Brown College or Institute.    At SBC, a minimum score of 140 was required to gain admission to its associates degree programs.    The admissions department, whose bonuses were directly tied to the number of successful enrollments at SBC, oversaw the administration and proctoring of entrance exams.    Numerous students were allowed to take the entrance exam multiple times within a few days or one week in order to pass.    As well, at least some SBC students were allowed to cheat on their entrance exams.    Relator believes many of the students admitted with "passing" scores after the second, third or fourth attempt were not actually qualified for admission based on CPAT requirements.

39.     Soon after he began working as Director of Education for Defendants, Relator assigned staff members not affiliated with the admissions department to proctor entrance exams during the weekdays. This way, the exams would be proctored by employees whose performance was less directly tied to successful enrollments. Unfortunately, his staff members could not cover weekend entrance exams, so members from the admissions department still proctored those exams. Interestingly, as soon as Relator implemented changes to the administering of entrance exams, the attendance at weekend entrance exams dramatically increased.

40.     As part of his job, Relator had access to student files containing application materials, including high school transcripts. An alarming number of students admitted into Defendants' SBC program received failing grades in previous high school or GED programs, received special education high school diplomas, and/or had Individualized Education Programs ("IEPS") through their high schools, yet they were accepted into and enrolled in an accelerated program at SBC that provided very little one-on-one attention from instructors.

41.     During his tenure as Director of Education, all new students were required to sit for a READI assessment. The test results from these READI assessments demonstrate the remedial needs of the students attending SBC. For example, only 50% of the students who took a READI assessment exam on October 21, 2008 passed the reading comprehension section, when a passing score was 70%. Despite these test results, Defendants still utilized an accelerated education model that placed its students in

11

short teaching terms of only five weeks, presumably in an effort to enroll more students in the programs and obtain more federal funding.

42.     Every five weeks, up to one hundred new students were admitted to the SBC program. On information and belief, the number of students packed in each classroom also violated city fire code.

43.     Relator addressed his concerns about SBC's enrollment practices and the remedial nature of the student body to former Director of Admissions, David Kagan, on numerous occasions.

44.     Relator also raised concerns about the remedial nature of the student body to SBC's President, Dr. Steve Guell, in late-2008. Guell chastised him and stated "we are not going to have this discussion again."

45.     In his role as Director of Education, Relator participated in weekly calls with the other Directors of Education at the Sanford-Brown Colleges and Institutes across the country, as well as with Mike Schaeffer, Vice President of Academic Affairs, and occasionally CEC's Senior Vice President, Health Education, George Grayeb. The calls focused exclusively on plans to increase enrollment and retention figures at the Sanford-Brown campuses in order to increase Defendants' bottom line; they did not involve any discussion about developing the education programs offered, the success of current programs, or issues involving students that did not relate to financial aid or tuition.

46.     Reports made available to all of the Sanford-Brown Directors of Education, including Relator, demonstrate that Defendants' primary focus was on recruiting students in order to obtain tuition and federal funding. The reports contained a summary of

12

admissions, enrollment, re-enters, attrition, financial aid, bad debt and show rate figures, and included data from all of the Sanford-Brown Colleges and Institutes across the country.

47.    The reports also contained misleading student placement figures, as the percentages included all students who obtained jobs after graduating from a Sanford-Brown program, regardless of the type of job. No consideration was given to whether the job required or used any of the knowledge, skills or training acquired during school; for example, even if a student became employed as a barista at Starbuck's or worked at McDonald's, they would be considered "placed" for purposes of Defendants' student placement percentages.

### *Demanding Student Attendance and Encouraging Harassment*

48.    During his employment, Relator uncovered attendance cards containing forged student signatures. The attendance cards were used to justify billing for Title IV/HEA subsidized tuition because students receiving Title IV/HEA program funding are required to attend a certain percentage of classes. SBC's administrators were aware of these fraudulent attendance card practices.

49.    SBC's President required SBC's Retention Coordinators to make repeated, often harassing, telephone calls to absent students, their families, friends, neighbors and places of employment in order to get the students to show up to class. Again, this ensured that SBC could recover more Title IV/HEA subsidized tuition.

## Distributing Unwarranted Passing Grades and Manipulating the Grading System

50. On December 10, 2008, Relator received a memorandum regarding changes to the SBC's grading policy for the health care service programs. The memorandum explained that Defendants had eliminated the "D" grade from the grading system, purportedly because "a 'D' grade implies below average performance. Since the consumers of health care services expect better than below average service, we feel that our students should not learn to accept below average performance as satisfactory while they are in school." The memorandum went on to explain that the grading scale would be changed so a "C" grade was expanded to 65-79%. The "A" and "B" grading scales remained unchanged. In order for students to be eligible to receive Title IV/HEA program funding, students must maintain a grade point average of at least a 2.0, which is equivalent to a C on a standard grading scale.

51. Relator observed SBC's faculty utilizing a very lenient grading scale and frequently passing students even when their work product did not support passing grades. Because these students were "passing," they were allowed to remain enrolled at SBC and continue to obtain federal funding. On information and belief, the faculty's lenient standards were a product of the pressure placed on faculty by admissions and senior management to keep students from failing out.

52. One faculty member in particular, Dr. Marissa Tadda, refused to pass students that did not adequately and competently complete her coursework. As a result, Steve Guell placed her on an informal probation and required her to sit in the library for an entire five week term during the 2008 school year to allegedly "learn how to teach

14

better." Not surprisingly, Dr. Tadda quit working at SBC before the end of the five week term.

53. At one of the last faculty meetings that Relator attended in December 2008, Steve Guell openly warned faculty that "those with high failure rates will not be teaching here much longer."

54. Relator often handled issues relating to students who were either failing or in very poor academic standing at SBC, and Defendants' response to Relator's suggestions for each student further evidences Defendants' predatory model. For example, in mid-July 2008, Relator emailed President Guell regarding a student who was in very poor academic standing, explaining that Relator advised her to seek individualized and specific training outside of SBC. Relator also relayed to President Guell that he was asked by the student if she would still have to pay back all the money she owed for tuition, considering she would not complete her courses or receive any kind of degree or certificate from SBC. Relator asked President Guell how to proceed, and recommended that this particular student's tuition be refunded so she could move forward without substantial debt. President Guell responded, "I've noticed that in cases like this one, it is best not to push for an answer."

55. Prior to Relator's departure from his position as Director of Education for Defendants, he addressed some of his concerns with Defendants' predatory education model with Thomas Hunter, Director of Compliance. In an email dated December 16, 2008, Relator explained

15

...I believe it tough to deny that Admissions can and laregely[sic] does operate with disregard for the goals and expectations of Academics (say, developing qualified graduates, or even retention – which then can actually work AGAINST the business mission itself). Surely you would agree that the admissions process plays a LARGE part in academic outcomes and success. But neither our IEP nor our organizational model (and its subsequent fiscal incentives) really reflect that truth...

56. Ultimately, Relator resigned from his position as Director of Education in December 2008, and his last day at SBC was January 5, 2009.

## Defendants' Violations of the False Claims Act

57. As part of Defendants' predatory scheme, Defendants' employed, and on information and belief continue to employ, numerous tactics that blatantly violate Title IV/HEA program requirements, thus rendering Defendants ineligible to receive such federal funding. These tactics include, but are not limited to: (1) providing incentive-based compensation that is directly or indirectly linked to enrollment in Defendants' programs; (2) misrepresenting grading figures and graduate placement rates to accrediting agencies each year; and (3) failing to derive at least 10 percent of revenues for each fiscal year from sources other than Title IV/HEA program funds.

### Incentive Based Compensation for Employees

58. Title IV/HEA prohibits colleges and universities from providing "any commission, bonus, or other incentive payment" to employees "based directly or indirectly on success in securing enrollments or financial aid." 20 U.S.C. §1094(a)(20).

59. In direct violation of Title IV/HEA rules, during and before Relator's tenure as Director of Education at SBC, SBC employees were directly compensated based upon success in securing enrollments. In fact, at one point, individual

16

contributions to enrollment figures were considered in the formula determining bonuses for employees.

60. On June 27, 2008, Relator received a letter from CEC Senior Vice President, Organizational Effectiveness and Administration, Thomas G. Budlong, regarding the 2008 CEC Management Bonus Program. The letter detailed changes in Defendants' compensation structure and in doing so essentially admitted Defendants' failure to follow Title IV/HEA requirements. The letter explained that effective immediately, "**The Individual Performance element is no longer dependent upon the achievement of financial targets.**" (Emphasis in original.)

61. On information and belief, prior to the date of Vice President Budlong's letter, CEC's employees across the country received credit for student enrollment and/or secured financial aid, which was ultimately used to determine the employee's compensation for the year.

62. After the date of Vice President Budlong's letter, SBC's employee compensation was indirectly tied to the success in securing enrollments or financial aid because employee bonuses were tied to SBC's profitability, which directly hinged on the number of students admitted and retained by SBC each year.

### *Misleading, Inaccurate and Inflated Reporting to Accrediting Agencies*

63. Title IV/HEA requires that Defendants "will meet the requirements established by… accrediting agencies or associations…." 20 U.S.C. §1094(21). This is a prerequisite for Defendants' eligibility to request and receive Title IV/HEA funds. Title IV/HEA also prohibits an institution from engaging in "substantial misrepresentation of

17

the nature of its educational program, its financial charges, or the employability of its graduates." 20 U.S.C. § 1094(c)(3)(A).

64. As part of the mandatory accreditation process, Defendants complete Annual Institutional Reports that are maintained in the SBC's Compliance Director's Office, and also distributed to CEC's President for review. These reports, which were also provided to accrediting agencies including ACICS, contain knowingly misleading, inaccurate and inflated information. For example, Defendants provided, and on information and belief continue to provide, misleading and inflated placement figures and data. The same figures sent to all the Directors of Education at Sanford-Brown schools regarding placement rates were also provided to ACICS, in order to maintain accreditation. Relator has personal knowledge of these misrepresentations, as he reviewed the information provided by Defendants to accrediting agencies during his tenure at SBC.

65. As well, in June 2008, Defendants provided a "Self-Study Narrative" to ACICS that contained a summary of graduate placement rates that included all individuals who obtained any kind of employment after graduation, without consideration of the type of job obtained, even though SBC represented that the placement rates were within a graduate's field of study.

66. SBC also provided completely false information to ACICS during the accreditation site visit. In particular, Relator observed the SBC's former Criminal Justice Department chair forging signatures on faculty performance reviews, which were shown to ACICS as part of the accreditation site visit.

18

67.     Defendants also misrepresented, and on information and belief continue to misrepresent, grades given to students and the grading system used. For example, faculty at SBC largely distributed passing grades, even if the work product did not merit passing grades, and these figures were subsequently reported to ACICS. Further, on information and belief, the modification in the grading system (i.e. elimination of the "D" grade and expansion of the percentage constituting a "C" grade) was not reported to ACICS.

## *Failure to Adhere to 90/10 Rule*

68.     Lastly, Title IV/HEA also requires that "the institution will derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds." 34 CFR § 668.14 (16). Defendants did not, and on information and belief, do not adhere to this Title IV/HEA program requirement. In fact, during Relator's employment, SBC formed a "partnership" with Sanford-Brown College, Tampa, for the sole purpose of circumventing this Title IV/HEA requirement. Because Sanford-Brown College, Tampa had a smaller percentage of students who relied on federal funding than SBC did, Defendants created the "partnership" to allow them to state that at least 10% of its revenues came from sources other than Title IV/HEA. There was no other link between the two schools.

## CAUSES OF ACTION

## COUNT I

## KNOWINGLY FALSE STATEMENTS TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED, IN VIOLATION OF THE FALSE CLAIMS ACT, *31 U.S.C. § 3729(a)(1)*

69.     The allegations made in the preceding paragraphs are realleged as if fully stated herein.

70.     Under the federal False Claims Act, 31 U.S.C. § 3729, "[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."

71.     "Knowing" and "Knowingly" are defined by the statute to "(A) mean that a person, with respect to the information--(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b).

72.     The term "claim" is defined by the statute to include "any request or demand, whether under a contract or otherwise, for money or property . . . that is presented to an officer, employee, or agent of the United States . . ." 31 U.S.C. § 3729(b).

73.     As previously stated herein, Defendants have defrauded the United States of America by knowingly presenting, or causing to be presented, to one or more officers,

20

employees or agents of the United States of America, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

74.     On information and belief, Defendants continue to make such false submissions, as Defendants' fraudulent conduct is continuing and ongoing.

75.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid and continues to pay directly or indirectly thousands of false claims and has spent millions of dollars pursuant to the Title IV program.

76.     Because of Defendants' conduct, the United States Government has suffered actual damages. Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

77.     Each and every such fraudulent claim would be subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

## COUNT II

### KNOWINGLY FALSE RECORDS OR STATEMENTS TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED, IN VIOLATION OF THE FALSE CLAIMS ACT, *31 U.S.C. § 3729(a)(2)*

78.     The allegations made in the preceding paragraphs are realleged as if fully stated herein.

79.     In performing all of the acts described herein, Defendants have knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of

21

the False Claims Act, 31 U.S.C. § 3729(a)(2), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to Defendants obtaining payments from the United States.

80.     On information and belief, Defendants continue to make, use or cause to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, as Defendants' fraudulent conduct is continuing and ongoing.

81.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid and continues to pay directly or indirectly thousands of false claims and has spent millions of dollars pursuant to the Title IV program.

82.     Because of Defendants' conduct, the United States Government has suffered actual damages. Damages to the Government include, but are not limited to, the full value of any such fraudulent claims.

83.     Each and every such fraudulent claim would be subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

22

## PRAYER FOR RELIEF

WHEREFORE, Brent M Nelson, on behalf of the United States Government, prays:

1. That this Court order Defendants to cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2. That this Court enter judgment against Defendants in favor of the United States of America an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500.00 to $11,000.00 for each violation, pursuant to 31 U.S.C. § 3729(a);

3. That the Relator be awarded all costs and expenses incurred in bringing this action, including reasonable attorney's fees, pursuant to 31 U.S.C. § 3730(d)(1)(b);

4. That in the event the United States Government continues to proceed with this action, the Relator be awarded an amount for bringing this action in an amount of at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim;

5. That in the event the United States Government does not proceed in this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25 percent nor more than 30 percent of the proceeds of any award or settlement;

23

6. That the Relator be awarded pre-judgment and post-judgment interest;

7. That a trial by jury be held on all of these issues; and

8. That the United States Government and the Relator receive all relief both at law and at equity to which they may reasonably appear to be entitled.

Dated: 07/20/12

NICHOLS KASTER, PLLP

Steven Andrew Smith (MN Bar #260836)
    smith@nka.com
Sofia B. Andersson-Stern (MN Bar #0350709)
    andersson@nka.com
Katherine M. Vander Pol (MN Bar #0390036)
    vanderpol@nka.com
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878

ATTORNEYS FOR RELATOR